519 So.2d 810 (1987)
STATE of Louisiana Through Shirley McNAMARA, Secretary of the Department of Revenue and Taxation, et al.
v.
NEW ORLEANS AUTO TITLE COMPANY, INC., et al.
No. CA 86 1575.
Court of Appeal of Louisiana, First Circuit.
December 22, 1987.
Rehearing Denied February 24, 1988.
Writ Denied April 29, 1988.
*811 James Dixon, Baton Rouge, for plaintiffs-appellees State, et al., Dept. of Public Safety-Legal Section.
Richard Bates, Jr., Harry T. Widmann, New Orleans, for defendants-appellants New Orleans Auto Title Co., Inc., et al.
Before SHORTESS, LANIER and CRAIN, JJ.
*812 LANIER, Judge.
This action commenced as a suit by the Secretaries of the Departments of Revenue and Taxation and Public Safety (hereinafter sometimes called the State) for collection of taxes, license and other fees, penalties, interest and amounts due on dishonored checks, totaling $129,379.39. Made defendants were the New Orleans Auto Title Company, Inc. (NOAT) and five automobile dealers[1] from the New Orleans area (dealers). The dealers answered and filed third party demands against NOAT contending the money claimed by the State had been paid by them to NOAT. NOAT answered and filed a reconventional demand against the State for $287,000 contending that State employees improperly diverted that amount of NOAT money and the State was liable for this conduct. Prior to trial, the State and the dealers settled their portion of the suit with oral stipulations that the State was entitled to judgments against the dealers[2] and with assignments by the dealers to the State of all of their rights in a certificate of deposit pledged by NOAT to the dealers. However, there is no formal judgment to this effect in the record before us. After hearing the merits, the trial court rendered judgment on the main demand in favor of the State against NOAT for $129,379.39 and rendered judgment on the reconventional demand in favor of NOAT against the State for $77,470.00. This judgment does not rule on the third party demands by the dealers against NOAT. NOAT took this devolutive appeal. The State has not appealed or answered the appeal.

FACTS
NOAT is an automobile title transfer company doing business primarily in the New Orleans area. NOAT business is conducted principally by Jerome W. LaGrange, its president. NOAT would provide whatever notarial work its customers required for the sale of automobiles and would receive the license and transfer fees and taxes collected by its customers for these transactions. NOAT would deposit the fees and taxes in its account. NOAT would then take the pertinent documents (depending on the nature of the transaction) to the Office of Motor Vehicles of the Department of Public Safety (Office) and pay the Office with a NOAT check. The Office would give the appropriate documentation to NOAT, and NOAT would give these documents to its customers. NOAT charged various fees for these services. On occasion, NOAT would take hundreds of these transactions to the Office for processing.
In 1977 or 1978, a backlog of work developed in the New Orleans Office. In an attempt to alleviate this backlog, the Office instituted an unofficial policy of allowing NOAT, and some others, to tender checks payable to the Department of Public Safety (DPS), signed by NOAT, but with the amount remaining blank. The Office employees would process the transactions submitted, calculate the amount of fees and taxes due, fill out the proper amount on the checks tendered and put the license plate numbers of the automobiles involved in the transactions on the back of the checks. A copy of the front and back of each check was made and returned to NOAT.
In 1981, NOAT's bank informed it that its checking account was over $100,000 overdrawn. In his testimony, LaGrange described what happened next, as follows:
I called the motor vehicle. I asked for Ruby Davis. Ruby Davis came on the phone and I said, `Ruby, something is seriously wrong, somebody is stealing from us.' She broke crying on the phone and she said, `I am.' She said, `I've been embezzling your account.' And then she asked me would I give her a few days to get the moneyI don't know where she would have got itand would I give her *813 a few days so she could put it all back in there again, and I said, `No, Ruby, I'm calling the police right now.'
LaGrange notified the appropriate authorities and ordered NOAT's bank to stop payment on all outstanding checks payable to DPS. The total amount of these checks was $214,970.98.
This suit followed.

SUFFICIENCY OF THE STATE'S EVIDENCE ON THE STOP PAYMENT CHECKS

(Assignment of Error Number 1)
NOAT contends the trial court committed error by rendering judgment in favor of the State "despite the fact that the State offered no evidence on the essential allegations of its petition." NOAT asserts the State failed to prove by competent evidence "that title transactions occurred which gave rise [to] a tax obligation." Specifically, NOAT argues as follows:
Since the State had the burden of proof it was obliged to prove defendant's indebtedness for each and every transaction. Yet it failed to offer any proof whatsoever that defendant was indebted on even a single transaction. Indeed with regard to the fees alleged due on non-title transactions the State had no evidence whatsoever connecting defendant with these transactions other than the fact that the State itself had listed them on the back of defendant's checks.
At the trial, Richard L. Clousing testified he was the Assistant Receipts Officer in charge of the audit staff for DPS. He further testified without objection that DPS received $214,970.98 in stop payment checks from NOAT. Clousing produced the checks in court, and they were filed in evidence. NOAT objected to the admission of the checks into evidence because the underlying obligation for the checks (the fees and taxes due) had not been proven and because the checks were hearsay. Subsequently, NOAT objected to the checks on the following grounds:
MR. BATES: Well, he's made his proffer nowhis proffer now, your Honor, and I'd like to object to the checks, based upon hearsay on the grounds that he has not brought the declarant in, the declarant is available, and further, you know, that those are printed checks, your Honor. It is hearsay and the people who have now filled out the amounts of the checks are not here, nor is the endorser.
LaGrange did not deny his signature on the NOAT checks, either in the NOAT pleadings or in his trial testimony. In fact, LaGrange identified his signature on several NOAT checks. A check is a negotiable instrument for purposes of Louisiana's Commercial Laws. La.R.S. 10:1-101 and 10:3-104. La.R.S. 10:3-307 provides, in pertinent part, as follows:
(1) Unless specifically denied in the pleadings each signature on an instrument is admitted. When the effectiveness of a signature is put in issue
(a) the burden of establishing it is on the party claiming under the signature; but
(b) the signature is presumed to be genuine or authorized except where the action is to enforce the obligation of a purported signer who has died or become incompetent before proof is required.

(2) When signatures are admitted or established, production of the instrument entitles a holder to recover on it unless the defendant establishes a defense. [Emphasis added.]
The signatures on the NOAT checks are admitted because NOAT failed to deny them in its pleadings. Calcasieu Marine National Bank of Lake Charles v. Greene's Marine Products, Inc., 386 So.2d 926 (La.App. 3rd Cir.), writ denied, 390 So.2d 202 (La.1980). The checks, on their faces, are payable by NOAT to the order of the "La. Dept. of Public Safety" at NOAT's bank. Clousing, as the representative of DPS, presented these checks in court. This is sufficient authentication to make the checks admissible into evidence. Citizens Bank & Trust Co. v. Consolidated Terminal Warehouse, Inc., 460 So.2d 663 (La. App. 1st Cir.1984). The checks themselves are written evidence of the debt owed by *814 NOAT to DPS and constitute a prima facie case for the State. Pierce v. Thompson, 468 So.2d 1379 (La.App. 1st Cir.1985).
Even though the State proved a prima facie case for a $214,970.98 debt owed by NOAT to it, the State proceeded to show the following credits on this debt in favor of NOAT:

(1) payment to DPS by NOAT on
 April 2, 1981 $28,888.04
(2) payments made by NOAT in stop
 payment checks for persons[3]
 other than dealers in this suit 47,075.43
(3) payments made by NOAT in
 checks that cleared for a dealer[4]
 not a party to this suit 19,855.88
 __________
 TOTAL $95,819.35

Thus, after applying these credits, the State proved a debt by NOAT on the stop payment checks of $119,151.63 ($214,970.98 less $95,819.35).
At this point, the burden of proof on these checks shifted to NOAT. NOAT's principal defenses are that Ruby Davis completed NOAT checks for unauthorized amounts and/or altered them to make them payable to herself. La.R.S. 10:3-407 provides, in pertinent part, as follows:
(1) Any alteration of an instrument is material which changes the contract of any party thereto in any respect, including any such change in
(a) the number or relations of the parties; or
(b) an incomplete instrument, by completing it otherwise than as authorized; or
(c) the writing as signed, by adding to it or by removing any part of it.
(2) As against any person other than a subsequent holder in due course
(a) alteration by the holder which is both fraudulent and material discharges any party whose contract is thereby changed unless that party assents or is precluded from asserting the defense;
(b) no other alteration discharges any party and the instrument may be enforced according to its original tenor, or as to incomplete instruments according to the authority given.
[Emphasis added.]
La.R.S. 10:3-115 provides as follows:
(1) When a paper whose contents at the time of signing show that it is intended to become an instrument is signed while still incomplete in any necessary respect it cannot be enforced until completed, but when it is completed in accordance with authority given it is effective as completed.
(2) If the completion is unauthorized the rules as to material alteration apply, even though the paper was not delivered by the maker or drawer; but the burden of establishing that any completion is unauthorized is on the party so asserting.

[Emphasis added.][5]
NOAT has presented no evidence on the stop payment checks to show unauthorized completion or material alteration.
Accordingly, this portion of this assignment of error is without merit.
SUFFICIENCY AND LEGALITY OF EVIDENCE SUPPORTING STATE'S CLAIM AGAINST NOAT FOR PAYMENTS BY THIRD PERSONS FOR FEES AND TAXES DUE BY NOAT'S DEALERS

(Assignments of Error Numbers 1(a), 1(b) and 2)
In the trial court, the State attempted to recover $13,729.05[6] from NOAT for fees and taxes paid by Mossy Motors and the Bank of New Orleans, which fees and taxes the State contends were actually due and owing by NOAT's five dealer customers *815 who were made defendants herein. NOAT contends there is insufficient proof to show NOAT's obligation for these fees and taxes, evidence was erroneously admitted to support this claim, the trial court "erroneously relied upon the testimony of an incompetent witness thus rendering a judgment based upon false assumptions and unsupported conclusions" and the trial court erroneously relied on an exhibit not offered into evidence. In addition, NOAT asserts that, if Mossy Motors and Bank of New Orleans paid to the State fees and taxes due to the State by the dealers, then Mossy Motors and the Bank of New Orleans would be the proper parties to pursue this claim, not the State which has been paid.
Clousing testified that DPS's audit revealed that Ruby Davis was altering Mossy Motors, Bank of New Orleans and NOAT checks. The audit revealed that on November 24, 1980, and January 5, 1981, fees and taxes for NOAT's five dealer customers were paid for with Mossy Motors and Bank of New Orleans checks which totaled $13,729.05. Clousing gave this testimony, after referring to plaintiff's exhibit 5, which he described as "a schedule of New Orleans Auto Title work that was processed on Bank of New Orleans checks and Mossy Motors checks." Although plaintiff's exhibit 5 is stamped "FILED IN EVIDENCE", the transcript's exhibit index shows "P-5 LIST TITLE WORK MOSSY & BNO. (NOT OFFERED)" and a review of the transcript does not show that this exhibit was filed in evidence. The Mossy Motors and Bank of New Orleans checks from which plaintiff's exhibit 5 was prepared were not presented in court by Clousing or anyone else. The record does not reflect if the State kept the money it received from these checks or refunded it to Mossy Motors and the Bank of New Orleans. No one representing any of the dealers was called to testify about the transactions in question and, in particular, whether or not the fees and taxes for any of the transactions were given to NOAT for payment to the Office. LaGrange was not questioned about any of these transactions specifically, nor does the record reflect that a subpoena was issued for NOAT records concerning them.
While cross-examining Richard Clousing, NOAT's counsel elicited the following testimony:
Q. As I understand this chartand this is the first time I've ever seen it you have a series of transaction dates, license numbers, and the amounts of the checks and the dealer; like for instance, Banner Chevrolet and Gandy Toyota, and they were paid by Mossy Motors. Okay. Now, whatby your testimony today, are you stating that this work was wrongfully credited to Orleans or to New Orleans Auto Title?
A. No, I'm not saying it was credited. I'm saying that the taxes and fees owed on these individual transactions were not paid by New Orleans Auto Title. They were paid by checks from Mossy Motors, from Bank of New Orleans. They were not paid for by New Orleans Auto Title.
Q. But it appeared on their check?
A. No, not on New Orleans Auto Title check. It appeared on Bank of New Orleans checks, Mossy Motors checks.
Q. So whatso Banner Chevrolet had work and it was paid for by Mossy Motors
A. By Mossy Motors check; correct.
Q. Okay. But that doesn't mean that the funds transferred through New Orleans Auto Title.
A. Since each one of the dealers listed in the dealer column were New Orleans Auto Title dealers, then he waswe charged him for that work.
Q. You charged him for that work?
A. That's correct.
Q. But you don't know if it was done exclusively by him. And you ran underyou ran under the assumption that New Orleans Auto Title was doing all the work for Banner Chevrolet; therefore, if Banner *816 Chevrolet work was processed through, it was rightfullyit was rightfully a debt of New Orleans Auto Title; is that correct?
A. I assume that all of the work for the dealers that he gave me the list for was done by him. Now, if he only did a percentage of that work, at the time we talked in New Orleans, he should have said he only did half their work or only did part of their work.
[Emphasis added.]
Jerome LaGrange testified that, while he did do approximately 99% of all the title transfer work for the dealers, about half of this was just notarial work, since certain purchasers chose to go to the Office and pay the taxes and fees themselves for different reasons. This testimony was corroborated by Betty Kitchens, a former employee of DPS, who testified, in pertinent part, as follows:
Q. Okay. Are you familiar with any applications for title that were received by your office that were notarized by Mr. LaGrange and yet not processed by his office?
A. Oh, yes. During the course of the day, just working in the window you would get a lot of individuals that came up that he had notarized their deals and they would bring it down to get their license plate and registration.
Q. Would some of those individuals pay in cash?
A. Oh, definitely. Most individuals paid cash at the windows.
Q. Okay. Did he do some work for dealers where he only notarized the title documents?
A. Oh, definitely.
Q. Mortgage companies?
A. I would say mostly the mortgage companies and then there was a lot of people that lived in, say, like Slidell that came down and bought a car. They wanted to go to the Slidell office to get a license plate that represented that area, that had a different letter from the New Orleans area. So therefore, they just wanted it notarized, pick up the paper work and take it into the public safety office there. So he would notarize it so they could just give it to the customer.
The record is totally devoid of competent legal evidence to show an obligation by NOAT to the State for this portion of the State's claim. American Supply Co. of Morgan City, Inc. v. Genina Marine Services, Inc., 470 So.2d 964 (La.App. 1st Cir.), writ denied, 475 So.2d 1107 (La.1985); Herlitz Construction Company v. Clegg Concrete, Inc., 415 So.2d 387 (La.App. 1st Cir.1982).
These assignments of error have merit.

SUFFICIENCY OF QUANTUM FOR NOAT

(Assignment of Error Number 3)
NOAT contends the trial court committed error by awarding it $77,470, instead of awarding it $152,000. NOAT asserts Ruby Davis admitted the theft of $152,000 from NOAT in a letter dated January 26, 1981, which was filed in evidence, and the State did not rebut this evidence.
The Ruby Davis letter reads as follows:
 January 26, 1981
I promise to pay to The New Orleans Auto Title Company2742 Bienville AvenueNew Orleans, La$152,00000 plus interest by June 30-1981Substantial payments are to be paid each month beginning February 1981
Payments are to be mailed to Mr. J. LaGrange at the 2742 Bienville address.
 [Mrs. Ruby Davis]
The State had no objection to the admissibility of this evidence. See discussion in D. Binder, The Hearsay Handbook, Exception 28, 332-343 (2nd ed. 1975); McCormicks Handbook of the Law of Evidence, § 262, 639-643 (E. Cleary 2nd ed. 1972). However, although evidence is admissible, the weight which is given to it is a separate question.
*817 In his testimony, LaGrange speculated that $269,000 was taken from NOAT. However, NOAT presented documentary evidence which only showed $78,370 in check alterations.[7] It is implicit from the trial court's reasons for judgment and judgment that no weight was given to the Ruby Davis letter or to LaGrange's speculation about the total amount of the loss. After carefully reviewing the record, we cannot say that this factual ruling is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
We note that the trial court made a $900 error in its calculation of the loss proven by NOAT, $77,470 instead of $78,370. The trial court judgment will be amended to reflect this correction.
Otherwise, this assignment of error is without merit.

DECREE
For the foregoing reasons, the judgment of the trial court is amended to decrease the award in favor of the State on the main demand to $119,151.63 and increase the award in favor of NOAT on the reconventional demand to $78,370. In all other respects, the judgment of the trial court is affirmed. NOAT is cast for the cost of this appeal.[8]
AMENDED AND AFFIRMED.
NOTES
[1] The five dealers made parties defendant were (1) Bailey Lincoln Mercury, Inc. (Bailey), (2) Banner Chevrolet, Inc. (Banner), (3) John Brown Olds, Inc. (Brown), (4) Gandy's Toyota, Inc. (Gandy's), and (5) Gentilly Dodge, Inc. (Gentilly).
[2] Judgment amounts were: Brown for $25,975.44, Bailey for $19,567.30, Banner for $31,960.90, Gentilly for $41,738.89 and Gandy's for $19,136.86.
[3] These were Mossy Motors and the Bank of New Orleans.
[4] This was Mossy Motors.
[5] Failure of consideration, extinguishment, fraud and illegality are affirmative defenses for which a defendant who pleads them bears the burden of proof. La.C.C.P. art. 1005; A Better Place, Inc. v. Giani Investment Company, 445 So.2d 728 (La.1984).
[6] This amount is listed as $14,729.05 on State exhibit 5 and as $13,729.05 on State exhibit 6. However, State exhibit 5 has a NOAT check for $1,000 which cleared and, thus, the correct amount is $13,729.05.
[7] NOAT presented the following canceled checks which were altered to make Ruby Davis an additional payee and which were endorsed by Davis:

Check No. Amount
38267 $ 8,000
38239 3,400
38196 6,700
38077 3,020
37790 4,000
37823 6,950
37886 10,250
37922 6,050
 _______
TOTAL $48,370

Further, no automobile license plate numbers are on the backs of these checks. NOAT also presented evidence showing that check number 38273 had been altered from an amount of $2,035.86 to $32,035.86, a difference of $30,000. Thus, the total amount of documented alterations was $78,370. NOAT also introduced evidence that check number 38274 was altered in amount from $800.39 to $9,800.39, a difference of $9,000. However, NOAT was given a credit for this check in plaintiff's exhibits 4 and 6 because it was a check for which NOAT paid Mossy Motors fees and taxes.
[8] The trial court's judgment does not assess costs. This may be done in the future in a rule to assess costs. La.C.C.P. art. 1920.